53 U.S. 24 (1851)
12 How. 24
JOSEPH P. THREDGILL, ADMINISTRATOR OF ARCHIBALD GOODLOE, DECEASED, APPELLANT,
v.
JOHN M. PINTARD.
Supreme Court of United States.

*26 It was argued by Mr. Lawrence, and there was also a brief filed by Mr. Morehead, for the appellant, and by Mr. Crittenden, for the appellee, on whose side a brief was also filed by Mr. H.S. Foote and Mr. Sebastian.
The counsel for the appellant contended that the decree is erroneous, and ought to be reversed. It is admitted, in the opinion rendered, that the title of Pintard was invalid, and that Goodloe might have obtained a rescission of his contract on this ground; but as he perfected his title by obtaining a pre-emption in his own name, his act, while he continued in possession, enured to the benefit of Pintard, who should only be compelled to account for the amount paid for the better title. Ordinarily a vendor and a vendee, and those claiming under a vendee, stand in the relation of landlord and tenant, and all acts of the vendee in perfecting his title enure to the benefit of the vendor. But this, from the nature of the case, must be confined to such acts as the vendor might himself have performed. Tunstall was a trespasser upon the public lands, going on Indian territory in express violation of law, and had no right which could be transmitted by him. Equity cannot enforce a contract founded on a violation of law. It is true he had an improvement, but it was one made in the teeth of a law of Congress; and if it was unlawful for him to make the improvement, it was but a continued *27 violation of law to place another man upon it. Congress afterwards, it is true, granted pre-emptions, which, if he had continued on the land, would have embraced his case. But can this give him any equity? It is well settled, by the practice of the department, under the sanction of the opinion of the Attorney-General, that if a man trespasses by settling on the public land, and afterwards places a tenant on the land, that the tenant is entitled to a pre-emption in his own name, and not the landlord. That is where there is an express and not a mere quasi tenancy, as in this case.
Neither Tunstall, or Pintard, or Rhodes, could have obtained a pre-emption. Goodloe alone was entitled, in his own right, by virtue of his own cultivation and settlement, and Pintard can derive no benefit from a contract illegal in its inception, and which could have been perfected by no act of his.
But if this view of the subject is wrong, the decree is radically erroneous in several particulars. Goodloe's obligation to Rhodes was not to pay to Pintard, as seems to have been assumed. He did not agree to stand in the shoes of Rhodes. Rhodes promised to pay in one and two years, with ten per cent. interest. Goodloe bound himself to pay to Rhodes the amount due to Pintard, when the legal title should be obtained. The giving a gross sum of $10,552, including the ten per cent. up to the rendition of the decree, with an accruing interest of ten per cent. upon the whole amount, makes the accruing interest about twenty per cent., upon the principal due. This can hardly be fairly construed as the true meaning of the contract between Goodloe and Rhodes, and is such a compounding of interest as cannot be tolerated by a court of equity.
The amount, however, decreed upon the principles established by the Circuit Court, is for too much by at least one thousand dollars. The number of acres for which Goodloe obtained a pre-emption was 168, and the court settled the quantity in fractional section six, at 11 acres, making 179, instead of 200, which they were estimated to contain. This, at $40 per acre, would make $7,160; adding ten per cent. interest upon the two instalments into which this sum was to be divided, and the aggregate sum, at the rendition of the decree, would be $14,736.

 The credits allowed by the court are as follows:
 March, 1838, . . . . . . . . . $600.00
 Interest at 10 per cent. to date of decree, . . . 543.50
 ________
 1,143.50
 ________
 May, 1839, . . . . . . . . . . . 1,163.00
 Interest at 10 per cent. to decree, . . . . . . 943.00
 ________
 2,306.00

*28
 January, 1840, . . . . . . . . . 200.00
 Interest at 10 per cent, . . . . . . 145.00
 ________
 345.00
 ________
 April, 1840  expenses of procuring pre-emption, . . 900.00
 Interest at 10 per cent to date of decree, . . . . . 630.00
 ________
 1,530.00
 ========

Making the aggregate amount of credits, including interest at 10 per cent., $5,324. This sum, deducted from $14,736, would leave $9,412, instead of $10,552 decreed by the court; so that, admitting that it was correct to aggregate principal and interest, and to give accruing interest upon the whole sum, the decree is for too much by more than $1,000.
It is also respectfully contended, that it was erroneous to decree a sale of the fractional quarter, in section six, without obtaining the legal title, or having the holder of it before the court, so that the purchaser could obtain it by decretal order. Pintard alleges, in his bill, p. 9, "That Ben. Taylor, of Chicot county, Arkansas, holds the legal title to said part of section six, and has held the same for some years." It is hardly necessary to urge, that it was erroneous to decree a sale of this land, without first obtaining the legal title from Taylor.
The form of the decree is also erroneous, and in violation of the established principles of equity jurisprudence. The defendant, Goodloe, was ordered to pay a gross sum of money, by a named day; and if not paid, the commissioner named in the decree was directed to sell the land, make a conveyance, deliver possession, &c.; leaving it to the commissioner to ascertain whether the money was paid or tendered, and to decide accordingly. Whether the tender was or was not a good one, or whether the payment was or was not made, was left to the adjudication of the commissioner, when it was the province of the court to decide such matters. The proper chancery practice on this subject is given with great clearness and precision in the case of Downing v. Palmateer, 1 Mon. 66.
The counsel for the appellee contended that the agreement on the part of Goodloe, to pay the purchase-money to Pintard, was founded upon a valuable consideration, and necessarily enured to the benefit of the latter, and upon which he might seek a remedy, although the contract was between Rhodes and Goodloe alone. Piggott v. Thompson, 3 Bos. & P. 149; Chitty on Contracts (5 ed.), 53; Marchington v. Vernon, 1 Bos. & P. 101 in notes; Martyn v. Hinde, Cowp. 437; Dutton v. Poole, 2 Levinz 210; 1 Ventris, 318.
*29 A pre-emption right is property, so regarded by the government and the community at large. In Arkansas, "all improvements on the public lands of the United States are subject to execution." Rev. Stat. p. 377.
To call a settler upon the public lands a "trespasser," is an outrage upon a policy of the government which has been steadily pursued for more than twenty-five years.
The great point, to which the others are subordinate is, that Goodloe obtained the possession of both parcels of land through Pintard, and by a recognition of his title. By means of that possession, Goodloe was enabled to obtain a pre-emption to the principal tract, and which he could not have obtained if Pintard had not sold to Rhodes, and Rhodes to Goodloe. The fact is admitted in his answer; and indeed it is perfectly manifest that, if Pintard had remained in possession, he could and would have obviated any defect in his title, by availing himself of some confirmatory act of Congress, or of the later pre-emption acts, that is, of 1834 or 1838.
It was not competent, therefore, for Goodloe to disavow the title of Pintard, because they stood in the relation of landlord and tenant. The purchase of Goodloe from Rhodes was made on the 13th of March, 1837. The pre-emption of 1814 was ordered to be cancelled on the 28th February, 1838, while Goodloe was in possession; and it is worth while to observe that one of the reasons for allowing him to enter the tract he did, under the act of 1838, was, that he alleged "himself to be the purchaser from the individual who made the first-mentioned entry."
It is not pretended that Pintard was guilty of any fraud, or that Rhodes was guilty of any; and, if there was fraudulent conduct, this court will be obliged to attribute it to Goodloe. Of that I say nothing, because the case, as I view it, does not demand it.
The principle stated by this court, in Galloway v. Finley, (12 Peters, 295,) most strongly and pointedly applies: "That if the vendee buys up a better title than that of the vendor, and the vendor was guilty of no fraud, he can only be compelled to refund to the vendee the amount of money paid for the better title." Searcy v. Kirkpatrick, Cooke's Tenn. Rep. 211; Mitchell v. Barry, 4 Haywood's Tenn. Rep. 136. Vide Morgan's Heirs v. Boone's Heirs, 4 Monroe, 297. Both the cases of Galloway and Searcy, above cited, must, I think, be regarded as conclusive upon the present. There is, indeed, a strong analogy between the three  a similarity not often found to exist, with this difference, as it appears to me,  that in the one at bar there are more equitable circumstances in favor of the vendor, and demanding *30 the interposition of a court of equity, than in the others.
In the case in 12 Peters, this court further declare, that, "in reforming the contract, equity treats the purchaser as a trustee for the vendor, because he holds under the latter; and acts done to perfect the title by the former, when in possession of the land, enure to the benefit of him under whom the possession was obtained, and through whom the knowledge that a defect in the title existed, was derived. The vendor and vendee stand in the relation of landlord and tenant; the vendee cannot disavow the vendor's title." Willison v. Watkins, 3 Peters, 45; Connelly's Heirs v. Chiles, 2 A.K. Marshall's Rep. 242; Wilson v. Smith, 5 Yerger's Rep. 398; Blight's Lessee v. Rochester, 7 Wheaton, 547. The vendor will be obliged to make an abatement in the purchase-money equal to what it cost to clear the title. Officer v. Murphy, 8 Yerger, 502; Meadows v. Hopkins, 1 Meigs, Tenn. Rep. 181; Marshall v. Craig, 1 Bibb, 396. No court will allow a vendee to pry into and discover defects in his own title, with a view to purchase an outstanding claim, to the prejudice of the vendor. He may perfect his title, it is true, but then it must enure to the benefit of the vendor; and all the vendee can conscientiously demand is the cost and expense of procuring the better title. In this case it is allowed to Goodloe  nine hundred dollars, all he asks; and which is certainly a very liberal allowance, but of which Pintard does not complain.
This very case furnishes a striking and forcible illustration of the soundness and justice of the doctrine thus laid down by this court. Goodloe, through Pintard, obtained a title to a tract of land by an expenditure of nine hundred dollars, which was worth sixty-five dollars per acre, or more than ten thousand dollars; and if he can escape the payment of the purchase-money due from Rhodes to Pintard, and which was assumed by Goodloe, he will pocket the last-mentioned sum, and obtain the rich fruits of Pintard's two years' labor on the land for nothing! Can this be tolerated? Can it be thought of? In Winlock v. Hardy, 4 Littell's Rep. 274, it was said, "that a tenant cannot deny the title of his landlord; nor can a person who enters upon land, in virtue of an executory contract of purchase, deny the right of him under whom he enters; for he is quasi a tenant, holding only in virtue of his vendor's title, and by his permission.
Vide Turly v. Rodgers, 1 Marsh. 245; Logan v. Steele's Heirs, 7 Monroe, 104; Tevis's Rep's, v. Richardson's Heirs, Id. 659; Fowler v. Cravens, 3 J.J. Marsh. 430.
Goodloe never placed himself in a situation to contest the *31 title of Pintard. If, upon the discovery of the defect in the title of the latter; if, upon the cancellation of the pre-emption certificate under the act of 1814, Goodloe had surrendered the land to Pintard, bona fide, he might, perhaps, have purchased a better title, and arrayed it in hostility to that of Pintard, and resisted the relief prayed for in the bill. This he did not do. He continued in possession; bought up a better title while in possession; nor is there any proof that he ever disavowed the title of Pintard, until the filing of his answer. 3 Marshall's Rep. 287.
The case of Wilson v. Wetherby, 1 Nott & McCord's Rep. 373, fully sustains this doctrine, and with regard to which this court, in Willison v. Watkins, 7 Wheat. 53, said: "In the case of Nott & McCord, 374, the court decide, that where a defendant enters under a plaintiff he shall not dispute his title while he remains in possession, and that he must first give up his possession, and bring his suit to try titles. To the correctness of this principle we yield our assent, not as one professing to be peculiar to South Carolina, but as a rule of common law applicable to the cases of fiduciary possession before notice." Ib. 54, 55, 56.
Goodloe, by holding the possession, and proving up a pre-emption in his own name, prevented Pintard from complying with his covenant as to making title; and, such being the fact, the familiar and well-settled principle applies, that if the obligee shall do any act to obstruct or prevent the obligor from performing his part of the contract, the obligor is thereby discharged from its performance; or, to speak more properly, the contract, as far as he is concerned, is in legal contemplation actually performed, and authorizes him to demand performance at the hands of the other party. Bac. Abr., tit. "Conditions," Q, (3.); 3 Com. Dig., tit. "Condition," L. 6; Co. Lit. 207; Powell on Contracts, 417, 418, 419; Pothier on Obligations, 127. In the case of Marshall v. Craig, 1 Bibb's Rep. 395, which in many of its features was analogous to the present, it was laid down as a correct principle, abundantly established by authority, "that wherever a man by doing a previous act would acquire a right, if, owing to the conduct of the other party, he is prevented from doing it, he acquires the right as completely as if it had been actually done." See the case, from page 379 to 396, and authorities cited.
In the cases of Majors v. Hickman, 2 Bibb, 217, and Carrell, v. Collins, Id. 429, it is decided that he who prevents the performance of a condition cannot avail himself of the non-performance. 3 Com. Dig. Condition, L. 7; Borden v. Borden, 5 Mass. 67; Clendennen v. Paulsel, 3 Missouri Rep. 230; Crump v. Mead, Id. 233.
*32 "If a purchaser," says Sugden, "takes possession under a contract, and he afterwards rejects the title, he must relinquish the possession." 2 Sugden on Vendors, 23.
The same principle as to obstructing or preventing the performance of a covenant is applicable to the portion of the southwest fractional quarter of section 6, T. 18 south, range 1 east, because Goodloe, by obtaining the bond of Ben. Taylor from Tunstall, prevented Pintard from getting title to the part embraced in the bond, and which Goodloe says has been found to contain only eleven acres. For this, however, he acknowledges himself liable, and expresses his willingness to pay, and says he "never did refuse to pay." As to title to said eleven acres of this section, as to his liability to Pintard therefor, Goodloe makes no contest; does not resist performance; but, on the contrary, recognizes Pintard's right to relief to that extent.
Indeed, from the proof, we are warranted in believing and assuming it as true, when taken in connection with his answer, that Goodloe has obtained the legal title. In his letter to Peter O'Flynn, employed by him as an agent to procure from Tunstall the bond of Ben. Taylor, dated June 1st, 1840, he says: "I have purchased a tract of land of John M. Pintard, the same he purchased of Thomas T. Tunstall; the title is all perfect except about 20 acres of the southwest fractional quarter of section 6, township 18, range 1 east. Tunstall holds Ben. Taylor's obligation to convey to a particular line known to the seller. Taylor is willing to convey, if Tunstall will send me the obligation. ... I have the original contract between Pintard and Tunstall, handed to me by Pintard, as an order for the obligation on Taylor. Col. Taylor's wife resides in Kentucky. If you will see Tunstall and forward me the obligation, directed to Richmond, Ky., I can have a deed acknowledged to bring down with me in September." Vide copy of letter attached to the deposition of O'Flynn.
Now, O'Flynn testifies, that the obligation was procured by him from Tunstall, and sent to Goodloe, and that Goodloe acknowledged the receipt thereof, and paid him for his services. (See O'Flynn's deposition.) The same fact is acknowledged in a letter from Goodloe to Pintard, dated Nov. 10, 1840. (See exhibit G, letter No. 4.) As Taylor, who held the legal title, was willing to convey to Goodloe, provided Goodloe could obtain this bond from Tunstall; as Goodloe did obtain the bond in 1840; and as at the time of filing his amended answer, near five years afterwards, he acknowledged his liability to this extent, and did not even hint at any inability to obtain title, nor declare that he had not obtained it, I think we are bound to conclude that the deed, which he said he could procure from Taylor, had been procured, or that he had derived a title to this part satisfactory *33 to himself, and thus entitling Pintard to compensation and relief. If he could not, or had not, obtained title, with the means in his hands to do so, he would most undoubtedly have insisted on it by way of defence in his answer. Under all the circumstances, silence is conclusive against him; but we have something more than that, namely, a distinct admission of liability, contained in his answer.
It may perhaps be said, that Taylor ought to have been made a party to the bill. In the first place, I beg leave to remark, that he was not materially interested in the suit; if he had any interest at all it was only nominal, and no beneficial purpose could have been effected by making him a party. He was ready and willing, as Goodloe informs us, to convey; and in fact no decree could have been taken against him; he would have been at best but a passive party; and as he could do nothing necessary to the perfection of the decree, the court was fully warranted in proceeding without him. Joy v. Wirtz et al. 1 Wash. C.C. Rep. 417; Van Reimsdyk v. Kane, 1 Gallison, C.C. Rep. 371; Mallow v. Hinde, 12 Wheat. 193; Hoxie v. Carr, 1 Sumner, C.C. Rep. 173; Wormley v. Wormley, 8 Wheat. 451.
But, in the second place, it is too late to make the objection, in this court, on appeal. It was an objection not taken in the Circuit Court, either by demurrer, plea, or answer; and surely the appellant cannot be allowed to surprise the appellee with it now. Want of proper parties must be objected to by demurrer, or plea, or answer, and cannot be urged at the hearing. Mitford's Eq. Pl. 146; Milligan v. Milledge, 3 Cranch, 320.
The next inquiry is as to the lien of Pintard for the unpaid purchase-money. The lien of a vendor of land against it is peculiar to a court of equity, and can be enforced only in that court. It exists as a charge or incumbrance on the land against the vendee and his heirs, and other privies in estate, and also against all subsequent purchasers with notice of the non-payment of the purchase-money. It is wholly independent of possession on the part of the vendor, and attaches to the estate as a trust equally, whether it be actually conveyed or only contracted to be conveyed. 2 Story's Equity, 462-467.
"Where a vendor," says Sugden, (Vendors, vol. 3, c. 18, p. 182, 183,) "delivers possession of an estate to a purchaser without receiving the purchase-money, equity, whether the estate be or be not conveyed, and although there was not any special agreement for that purpose, and whether the estate be freehold or copyhold, gives the vendor a lien on the land for the money." And he cites, as sustaining these positions; Chapman v. Tanner, 1 Vern. 267; Pollixfen v. Moore, 3 Atk. 272; 1 Bro. Ch. Cases, 302, 424; 6 Ves. Jr. 483; Mackreth v. Symmons, 15 Ves. Jr. 329; *34 Smith v. Hibbard, 2 Dick, 730; Charles v. Andrews, 9 Mod. 152; Topham v. Constantine, Toml. 135; Evans v. Tweedy, 1 Beav. 55; Winter v. Lord Anson, 3 Russ. 488.
"So, on the other hand," says he, "if the vendor cannot make a title, and the purchaser has paid any part of the purchase-money, it seems that he has a lien for it on the estate." 3 Atk. 1; 2 You. & Jerv. 493; 3 You. & Jerv. 262. Thus proving that the lien does not arise nor depend upon perfect title. The term "estate" is used, which "imports," says Coke, "the interest which a man has in lands." Co. Lit. 345, a; 4 Com. Dig. Estates, A 1.
According to the late Judge Story, "the principle upon which courts of equity have proceeded in establishing the lien in the nature of a trust is, that a person having gotten the estate of another, ought not in conscience, as between them, to be allowed to keep it, and not to pay the consideration-money. A third person, having full knowledge that the estate has been so obtained, ought not to be permitted to keep it without making such payment, for it attaches to him also, as matter of conscience and duty." 2 Story's Equity, 465.
Did not Goodloe get the land through Pintard, and with full notice that the purchase-money was unpaid? Nay, did he not engage to pay that purchase-money himself? As long as he held the possession of the land thus acquired, could he resist this lien? It must certainly be manifest that he could not. The proposition is clear, that Pintard has a lien upon the land derived by Goodloe, through him, which the Circuit Court properly recognized and enforced.
These are the principal points in this case, and upon a careful investigation of them, I think it is obvious that the decree must be affirmed: first, on the law of the case; and, second, upon the principles of common honesty, which exist among men, and which courts of equity will always enforce. I beg the indulgence of the court to allude to a few matters of minor importance.
1. It is insisted in the answer, that the dwelling-house of Pintard was upon section six, and that he was not entitled to a pre-emption under the act of 1834. To this I reply, that whether he was or was not entitled to a pre-emption under that act, is not material to the support of his right to relief. But in fact, he was so entitled. The dwelling-house which was there when Pintard purchased of Tunstall, in the spring of 1833, was probably situated on or near the meridian line which divides section six and section one; but the proof is clear, that all the other buildings, improvements, and cultivation, were upon the southeast quarter of section one, or the large tract, and to which Goodloe subsequently proved up a pre-emption and obtained *35 the legal title in his own name. Pintard was a settler, or occupant of that tract within the meaning of the act of 1834, (vide Instructions and Opinions, 2d vol. p. 589, No. 535; p. 597, No. 543,) and as such most unquestionably entitled to a preëmption.
2. Goodloe insists that of section six, sold to Rhodes by Pintard, and by Rhodes to himself, there was not enough embraced in the bond of Benjamin Taylor to make, with the other tract, two hundred acres; and that, upon ascertaining the boundaries and lines specified in said bond, it was found that it did not contain more than eleven acres. How it was ascertained he does not state; and we only have his own assertion, without proof, that there was but eleven acres. From the proof, (see deposition of Booth,) it appears that the portion of land, thus described by boundaries in said bond, must have amounted to more than eleven acres. The court, however, in the decree, assume that to be the quantity; and of this Pintard does not complain, and surely Goodloe cannot be permitted to do so. That there were not two hundred acres in the whole, could be no ground for a rescission of the contract, if Goodloe were complainant, nor can it furnish any defence to a specific performance when he is defendant. He obtained what he principally desired  obtained the dwelling-house and all the other buildings, all the cleared lands, and all the improvements; he obtained the principal object of his purchase; and, as there was no fraudulent misrepresentation or concealment on the part of Pintard, the case is a proper one for abatement in the amount of the purchase-money to the extent of the small deficiency. This is well settled by authority. Newland on Contracts, ch. 12, p. 251, 252; 2 Atk. 371; 4 Bro. C.C. 494; Drewe v. Crop, 9 Ves. 368; 7 Ves. 270; 6 Ves. 678; Calcraft v. Roebuck, 1 Ves. jr. 221; Dyer v. Hargrave, 10 Ves. 505; 2 Story's Equity, 88; 1 Sugden on Vendors, 506, 507, 508, 525, 526.
If an estate be sold at so much per acre, and there is a deficiency in the number conveyed, the purchaser will be entitled to a compensation, although the estate was estimated at that number in an old survey. 1 Sugden on Vendors, chap. 7, § 3, p. 525 to 535, and notes and cases therein cited, 6th Am. edit.
Where the contract rests in fieri, the general opinion has been, that the purchaser, if the quantity be considerably less than it was stated, will be entitled to an abatement, although the agreement contains the words more or less, or by estimation. Ib. 526; Hill v. Buckley, 17 Ves. 394; 1 Call. 313; 4 Mason, 419.
The utmost that Goodloe could claim, would be an abatement for the deficiency. This the court allowed him; or what *36 amounts to the same thing, charged him with the 168 96/100 acres, and the eleven acres at the contract price. Surely he will be obliged to resort to some other ground upon which to assail the present decree.
3. Goodloe has waived his right, if any he ever had, to object to Pintard's title. His letters, after having proved up a preëmption in his own name, and especially the payment made by him to Pintard on the 31st May, 1839, of $1,363 82/100, amount to a waiver. The preëmption having been proved up on the 15th February, 1839, this payment was made more than three months afterwards. The letters alluded to, beginning in January, 1840, and ending in October, 1841, embrace a period of near two years; and when that payment and these provisions to pay are taken into consideration, there could hardly be more conclusive evidence of such waiver. 2 Sugden on Vendors, 10-14; Margravine of Anspach v. Noel, 1 Madd. 310; 2 Swanst. 172; 3 You. & Coll. 291.
I beg leave to invite attention to the very able opinion of the Circuit Court, delivered by the district judge, the Hon. Benjamin Johnson. Viewing the whole record, it appears to me that Goodloe has no reasonable ground on which to assail this decree. All the payments made by him have been credited; the expense of procuring the better title, nine hundred dollars, has been abated from the purchase-money; and an abatement, at the rate of forty dollars per acre, has also been made for deficiency in quantity in section six. Surely he cannot conscientiously deny that justice has been done him; and, when his conduct in this transaction is scrutinized by a just and enlightened court, he can hardly expect to succeed in his appeal  hardly expect to escape that responsibility which the enlarged principles of a court of equity fix upon him.
The case of Bush v. Marshall, 6 How. 291, is referred to as being precisely in point.
Mr. Justice McLEAN delivered the opinion of the court.
This is an appeal from the decree of the Circuit Court, for the District of Arkansas.
Under the act of the 12th of April, 1814, Jane Mathers claimed a right of preëmption, by virtue of occupancy and cultivation, to the southeast quarter of section one, township eighteen south, range one west, containing one hundred and sixty-eight acres and ninety-six hundredths, lying south of the Arkansas River. She assigned her right to Thomas T. Tunstall, who entered and paid for the land at the Land-Office at Little Rock, the 24th of July, 1834, and obtained a patent certificate. On the 24th of February, 1838, this purchase was annulled by the Commissioner of *37 the Land-Office, on the ground that the Indian title to the land had not been extinguished when the settlement was made. The Indian title was relinquished to the United States by the Quapaw treaty, the 24th of August, 1818.
This tract was purchased of Tunstall by Pintard, in the spring of 1833, who took immediate possession, and made improvements on it. In the autumn of the same year he removed his family to the land, constructed cabins, stables, and other fixtures, and in the spring of 1834 he cultivated seventy-five or eighty acres in corn and cotton.
On the 23d of March, 1835, Pintard sold the above quarter section, and a part of the southwest quarter of section six, so as to make a tract of two hundred acres, at forty dollars per acre, to William Rhodes, who gave two notes of four thousand dollars each, payable in one and two years, with interest at ten per cent. per annum. The two hundred acres were sold by Rhodes to Goodloe on the 3d of March, 1837, for sixty-five dollars per acre. As a part of the consideration for this purchase, Goodloe agreed to pay Pintard the amount of his claim so soon as a regular title for the premises should be obtained.
Goodloe, on the 15th of February, 1839, proved a preëmption in his own name, under the act of June 22d, 1838, to the quarter section, and paying the purchase-money into the Land-Office, he obtained a patent in his own name. Prior to this, on his contract with Rhodes, he paid to Pintard nineteen hundred sixty-three dollars and eighty-two cents. But having obtained the title to the land in his own name, he refused to make any further payments to Pintard on the ground that his claim was void. To enforce the payment of the sum due him on the sale to Rhodes, Pintard filed the bill now before us, with a prayer that the land might be sold, or so much of it as should be necessary to discharge the balance due to him.
It must be conceded that the first settler upon this land, the Indian title to it not having been extinguished, could claim under the act of 1814, no preëmptive right. No laws giving to settlers a right of preëmption, can be so construed as to embrace Indian lands. Such lands have always been protected from settlement and survey by penal enactments. But, it appears that the Indian claim to this land was relinquished to the United States by treaty, in 1818; after which it was embraced by all general acts giving to settlers a right of preëmption.
By the act of the 26th of May, 1824, preëmption rights were given north of the Arkansas River, to all who were entitled to such rights, under the act of 1814, and by the third section of the act of the 1st of March, 1843, every settler on the public lands south of the Arkansas River was entitled to the same benefits *38 under the provisions of the act of 1814, as though he had resided north of said river. By these acts a right of preëmption was given in virtue of the first settlement upon the land.
But there was another and prior act which gave to the occupant of this tract a right of preëmption. By the act of the 19th of June, 1834, every settler upon the public lands prior to the passage of that act, who was in possession of a quarter section and cultivated a part of it in 1833, was entitled to a preëmption. In 1833, Pintard was in possession of the quarter section and cultivated a part of it, and he continued to occupy and improve it until the spring of 1835, when he sold his right to Rhodes.
By his purchase Goodloe entered into the possession of a valuable property, and if he desired to rescind the contract it was incumbent on him to relinquish the possession of the quarter section, and claim the cancelment of the contract. He cannot avail himself of the benefit of the contract and resist a performance of it on his part.
But Pintard, when he sold to Rhodes, was entitled to the preemption of the quarter section. His claim was not only a valid one, but it was sold on reasonable terms, as Rhodes in two years sold the same to Goodloe at an advance of twenty-five dollars per acre. The attempt, under such circumstances, of Goodloe to avoid the payment of the consideration, by procuring the title in his own name, is fraudulent. A title thus procured would have enured to the benefit of the vendor, even if the preëmptive right had not been vested in him.
A doubt is suggested in the argument whether Goodloe, having purchased from Rhodes, can be made responsible to Pintard. In his contract of purchase, as a part of the consideration, Goodloe bound himself to pay the amount due to Pintard from Rhodes on the previous purchase. It has been held that, under such circumstances, an action at law may be maintained in the name of the person to whom payment is to be made. But this is a case in chancery, and no one has doubted, that in equity, such a contract may be enforced.
Has Pintard a lien upon the land for the balance of the purchase-money? We think he has. Goodloe not only had notice of this claim, but he bound himself to pay it.
It is alleged that there is a mistake in the computation of the amount due, as decreed in the Circuit Court. If there be an error in the calculation, it is in favor of Goodloe, and of which he has no right to complain.
In their decree the Circuit Court gave the defendant a credit for the money paid to Pintard, and also a loan to him of two hundred dollars, and a liberal allowance for the expense of procuring the title. A proper deduction was also made for the deficiency in the number of acres sold.
*39 There appears to be no error in the decree; it is therefore affirmed, with costs.

Order.
This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Arkansas, and was argued by counsel. On consideration whereof, it is now here ordered and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs.