JOHN D. BUSH, APPELLANT, *v.* JACOB MARSHALL AND WILLIAM B. WHITESIDES.

Where the holder of a preëmption right to lots in the town of Dubuque sold them to another person, the facts, that the vendor had received certificates of his title, although the land-officers were not satisfied with their sufficiency, and that the vendor acted as the undisputed owner, were sufficient to negative the charge of fraud in his representing his title to be good.

The relinquishment, by the vendor, of his title to the United States, with a view to a public sale and completion of his title, was not fraudulent towards the vendee, if it was the purpose of the vendor to enable himself to convey a perfect title to his vendee.

If, at the public sale, the vendee himself became the purchaser, he became a trustee for his original vendor; and if, at the public sale, the original vendor became the purchaser, the title inured to the benefit of his vendee.

THE following statement of the case was the brief of *Mr. Howard*, who argued it.

This was an appeal from the Supreme Court of Iowa Territory, sitting as a court of equity, under the following circumstances.

On the 2d of July, 1836, Congress passed an act (chap. 262, 5 Statutes at Large, 70) for laying off the town of Dubuque, amongst other towns, under the direction of the surveyor-general. The 1st section directed lots to be laid out in a certain manner, and a plat returned to the Secretary of the Treasury, and within six months thereafter the lots should be sold to the highest bidder. The 2d section directed the lots to be classed according to their value into three classes, viz. at $40, $20, and $10 per acre, respectively; and gave a right of preëmption to those persons who had obtained a permit to settle, or who had actually occupied and improved the lots, paying for the lot according to its class.

On the 3d of March, 1837, Congress passed another act (chap. 36, 5 Statutes at Large, 178), amendatory of the former, substituting a board of commissioners for the surveyor. They were empowered to " hear evidence, and determine all claims to lots "; to reduce the evidence to writing, which they were directed to file with the register and receiver, together with a certificate in favor of each person having the right of preëmption. Upon payment for the lot being made to the receiver, the receiver was directed to give a receipt for the same, and the register to issue a certificate of purchase, to be transmitted to the commissioner of the general land-office, as in other cases of the sale of public lands.

The 3d section directed the register and receiver to expose the residue of the lots to public sale, after advertising, &c.

On the 8th of February, 1839, Marshall and Whitesides sold to Bush a preëmption right to two lots in the town of Dubuque, viz. No. 7 and No. 194. The deed is not upon the record, but the consideration is stated in the bill, and admitted in the answer (Rec. 3, 6), to have been three thousand dollars, one half of which, viz. $1,500, was paid in cash by Bush. To secure the payment of the other half, Bush executed a mortgage to Whitesides, and also gave his promissory note to Marshall for $1,790, payable on or before the 1st of October, 1839. Of this $1,790, $1,500 was for the purchase of the lots, and the remaining $290 was for rent in arrear, which was transferred to Bush.

It appears from the evidence of B. R. Petrikin, the register in the land-office in the town of Dubuque, that "Bush came frequently to the land-office to enter the lots No. 7 and No.

194, under the preëmption law, but was not allowed to do so by the land-officers, because the proof filed by William B. Whitesides with the commissioners, under the law laying off the town of Dubuque, did not satisfy the land-officers as being sufficient to maintain a right under the law in favor of White-sides's preëmption."

It appears, also, from the same evidence, that the land-officers "had received instructions from the general land-office, to expose all lots to public sale where the claimants should relinquish their right to preëmption (under the law laying off the town) to the United States."

In September, 1840, the lots in the town of Dubuque were offered at public sale. Bush went to the land-office, and protested against the lots No. 7 and No. 194 being offered at public sale.

Previous to the sale, however, it appears, from the testimony of Dougherty, that a "committee of arrangements had been appointed for the purchase of lots in the town of Dubuque"; that there was a "public bidder," who was a person selected by the claimants to lots in the town of Dubuque, to purchase the lots they claimed, as they were offered at the public sale.

It appears from the evidence of Dougherty, that the committee of arrangements called on Bush, and informed him that the committee desired him to make his relinquishment to lot No. 7, which he positively refused to do. The committee then erased the name of Bush, and inserted the name of Whitesides, and informed Whitesides immediately of the same; when he, the said Whitesides, came before the committee, and made his relinquishment to said lot.

It appears, also, from the testimony of Petrikin, the register, that Whitesides came to the land-office, and produced the deeds in relation to the property before the officers of the land-office, and the said officers considered that the said Whitesides had a right to relinquish his preëmption right, and thereupon the said Whitesides did relinquish; in consequence of which the lots No. 7 and No. 194 were put up at public sale.

The following statement of facts was agreed upon in the court below.

It is agreed the following statement of facts may be used, in the same manner as if the same were proved by witnesses on the hearing of the above causes : —

1st. That the lots mentioned in the foregoing pleadings were sold at a public sale of lots in the town of Dubuque, by the United States, in        last, at which sale John D. Bush, above named, became the purchaser of lot No. 7, and the above-named William B. Whitesides of lot No. 194.

2d. That said lots would not have been put up and sold at said sale, unless the said William B. Whitesides had relinquished all claim to the same to the United States previous to said sale ; and that said Whitesides did thus relinquish, previous to the same being put up to sale, and for the express purpose of having them sold at said sale.

3d. That said Bush objected and protested to said Whitesides against the said Whitesides thus relinquishing.

4th. That previous to said sale, and at the time of said relinquishment, and subsequent thereto (but previous to the sale), said Bush was informed by E. C. Dougherty and Whitesides, and by said Whitesides's agent, that his object in having the said lots put up to sale was expressly with a view that the title to them might be perfected in said Whitesides, so that he could make a good title to said Bush, upon said Bush paying the purchase-money for said lots. And also, that said Whitesides, by himself, or agent duly authorized for said purpose, did propose and offer to said Bush, that if said Bush would bid for said lots, and agree that his purchase should be under the contract for them set out in the pleading in the above causes, said Whitesides would make no opposition to his so doing, but was perfectly willing said Bush should become the purchaser with this understanding ; but that said Bush utterly refused so to do ; when said Bush was informed by said Whitesides, or by his agent, that said Whitesides would bid for said lots at said sale, in order to enable him to comply with his contract with said Bush. That said Whitesides and Bush were the only bidders for said lots at said sale, and that Philip S. Dade was the bidder for said Whitesides, of which the said Bush, previous to and at the time of said sale, was advised and informed. That the memorandum at the foot of the deed or mortgage, that said Bush was to furnish the money to pay for said lots, was there inserted by the express agreement and understanding of said Bush, at the time of executing said deed and mortgage.

The public sale took place in September, 1840, after Bush had refused to purchase under his contract. At the sale, the public bidder and Bush were the only bidders for the two lots No. 7 and No. 194, the public bidder bidding for Whitesides, of which Bush was informed previous to and at the time of said sale. The lot No. 7 was bid off to Bush, and No. 194 to Whitesides.

In April, 1841, Whitesides and Marshall filed a bill in the District Court of Dubuque county, praying a foreclosure of the mortgage and sale of both lots. After an answer and a general replication, the court decreed for the complainants, and ordered both lots to be sold. An appeal was taken to the Su-

preme Court of Iowa, where the decree of the court below was affirmed, and the cause was brought by appeal to this court.

It was argued by *Mr. Berry* (in a printed argument) and *Mr. Howard*, for the appellant, and *Mr. May*, for the appellees.

Mr. Justice GRIER delivered the opinion of the court.

This suit originated in the District Court for Dubuque county, in the Territory of Iowa. It was a bill in chancery to foreclose a mortgage given by the appellant, Bush, to Whitesides. The property mortgaged consisted of two lots (numbered 7 and 194) in the town of Dubuque, which Whitesides had sold and conveyed on the same day to the mortgagor, for the sum of $3,000; and the mortgage (dated 8th February, 1839) was given to secure the sum of $1,500, the balance of the purchase-money.

At the time of this transaction, the United States had not yet offered the lands on which the town of Dubuque was situated for sale. But notwithstanding the occupants of lots were mere tenants at sufferance only, they proceeded to make valuable improvements, under the expectation of the grant of a right of preëmption from the government, or, at least, that they could complete their title by purchase from it, when the lots should be offered for sale.

These possessions and improvements were treated as valid and subsisting titles by the settlers, and were the subjects of contract and sale by conveyances in the forms usual for passing a title in fee. On one of the lots which was the subject of the mortgage in question, a tavern-house and other improvements were erected, for which the tenant paid a rent of seventy dollars per month at the time of this purchase. The deed from Whitesides to Bush was not put in evidence, but, from the recitals of the mortgage and admissions of the answer, it appears to have been a deed in fee simple, with a covenant of general warranty. The mortgagor is estopped by his deed from denying seizin, and cannot make out a sufficient defence unless by proving payment of the money, want of consideration, or fraud which will avoid the contract.

Accordingly, the appellant, in his answer, has set up two grounds of defence by way of avoidance of his deed. First, fraudulent misrepresentation by the vendor to induce him to make the purchase; and, secondly, want of consideration from failure of title.

1st. The fraudulent misrepresentation charged consists of three particulars. First, that the vendor represented, "that he

held a valid preëmption right to the lots, by virtue of the laws of the United States in relation to town lots in the town of Dubuque"; secondly, that he represented that the fixtures in the tavern, to wit, the bar shelves and counter, formed a part of the property sold, whereas they were claimed and taken away by Hale, the tenant, and the house much injured by the moving and tearing away of said fixtures; and, thirdly, that by falsely representing Hale, the tenant, to be punctual in his payments, Bush was prevailed on to give his note to the complainants for the sum of $ 290, for the rent of the unexpired term; whereas Hale was not punctual, and defendant was unable to collect the rent from him.

The latter two of these charges may be summarily disposed of by the remark, that there is no evidence in the case of any representations by the complainants on the subject; and as the matter alleged in the answer is not responsive to the bill, but set up by way of avoidance, the defendant was bound to prove it.

But the first is the one chiefly relied on in the argument, and deserves more particular notice.

It is proved by Davis, the scrivener who drew the deed and mortgage, that Whitesides told Bush "that he, Whitesides, had a preëmption to the property." Was this representation false? The only evidence on the subject is in the testimony of Petrikin, the register of the land-office, who swears, "that the commissioners, appointed under the act of Congress laying off the towns of Dubuque, &c., filed in the land-office certificates in favor of Whitesides's preëmption to these lots, No. 7 and No. 194." He states, also, "that the land-officers had instructions from the general land-office to expose all lots to public sale, where the claimants should relinquish their right of preëmption to the United States." He states, moreover, "that the land-officers were not satisfied with the regularity or sufficiency of Whitesides's certificate"; but whether these doubts or opinions were well founded or not does not appear from any testimony in the case. The facts, also, that Whitesides was permitted to relinquish the preëmption right to the United States, and that no other person laid any claim to the possession and preëmption of these lots except Whitesides, and Bush, claiming under him, are conclusive, when taken in connection with evidence of a certificate in his favor by the commissioners, to show that the representation of Whitesides was not false or fraudulent, and that defendant has wholly failed to support this allegation, as set forth in his answer.

But it has been contended, that this relinquishment, made by Whitesides to the United States against the consent of Bush,

was fraudulent, and injurious to the interests of Bush. To this argument two answers may be given, either of which is conclusive. First, that there is no allegation in the pleadings on the subject; and, secondly, the evidence clearly shows, that, although Whitesides did relinquish his preëmption to the United States, and that, too, without the consent of Bush, yet the act was not fraudulent, as it was not intended, and did not tend, to do any injury to Bush. Whitesides, by his warranty, was bound, under penalty of $ 3,000, to obtain a good title for Bush, cost what it may, while Bush was bound to pay only the minimum or preëmption price. The relinquishment of his preëmption right by Whitesides was not intended as an abandonment of his claim, but was a plan adopted by himself, in common with the other claimants of lots in Dubuque, as the most convenient method of obtaining a title. By thus suffering them to be exposed to auction, they ran the risk of being compelled to pay more than the minimum or preëmption price for a title, but could not get it for less. The record admits that Bush knew "that Whitesides's object in having the lots put up to sale was expressly with a view that the title to them might be perfected in said Whitesides, in order that he could make a good title to Bush." It is not easy to apprehend how fraud can be predicated of the conduct of Whitesides, who, it is admitted, was using every endeavour to fulfil his contract, and obtain a good title for his vendee. As to the alleged fraud on the government by the conduct of the people in Dubuque on this occasion, it is sufficient to say that the question is not raised in the pleadings, nor the fact proved in the evidence.

We are of opinion, therefore, that the appellant has wholly failed to show any fraud or misrepresentation on the part of his vendors, which would justify a court of chancery in annulling an executed contract.

Indeed, the facts of the case tend rather to show that the fraud, if any, in this transaction, may be more justly charged to the party who is so liberal in imputing it to others.

If Bush could have thwarted Whitesides in his endeavours to procure the legal title for him, if he could hold the lot on which the tavern-house and improvements were situated (and valued at $ 2,200) for his bid of less than twenty dollars, and then recover the $ 2,200 from Whitesides, on his warranty, he will have effected what is commonly called a speculation; but one in the perpetration of which he ought not to expect the aid of a court of equity. The anxious disavowal of an intention "to defraud or wrong the complainants," contained in the defendant's answer, was not called out by any charge

Bush *v.* Marshall et al.

in complainants' bill, but seems rather to have resulted from a consciousness that his conduct was justly liable to such an imputation.

II. The other ground of avoidance is failure of consideration.

The answer alleges, that, at the public sale by the United State; lot No. 7 was purchased by defendant himself, and therefore the vendor is unable to comply with his contract by making him a title, and, moreover, that Whitesides has become the purchaser of lot No. 194, and therefore he, Bush, was without title to it.

This defence seems founded on an entire mistake or ignorance of the law; as the facts alleged lead to a directly contrary conclusion, and show that the defendant has a complete legal title. If Whitesides sold to him with covenant of warranty, and afterwards purchased the legal title, as the answer asserts, with regard to lot No. 194, then is the title vested in Bush, the vendee, by estoppel, and no further conveyance is necessary.

As to lot No. 7, Bush, having obtained possession under Whitesides, cannot, by the purchase of an outstanding title, defeat the claim of his vendor. It is a well-established rule of equity, " that if a vendee buys up a better title than that of the vendor, and the vendor was guilty of no fraud, he can only be compelled to refund to the vendee the amount of money paid for the better title." " Equity treats the purchaser as a trustee for his vendor, because he holds under him; and acts done to perfect the title by the former, when in possession of the land, inure to the benefit of him under whom the possession was obtained, and through whom a knowledge of a defect of title was obtained. The vendor and vendee stand in the relation of landlord and tenant; the vendee cannot disavow the vendor's title." (See Galloway *v.* Findlay, 12 Peters, 295, and cases there cited.)

In the present case, the vendee has bought in, for twenty dollars, the legal title to a property worth more than two thousand, the possession of which he received from his vendor; and not only so, but, contrary to good faith and fair dealing, he has interfered to overbid his vendor, who was using every endeavour to purchase the title for the use of his vendee, in fulfilment of his own covenants. The appellant has paid no more (or, if more, so little as to be unworthy of notice) than he agreed to pay for the purpose of getting the legal title. He has got a good title to the property, and ought in justice and equity to pay for it the full consideration which he has covenanted to pay.

The decree of the Supreme Court of Iowa must therefore

be affirmed, with costs, with leave to the appellees to sell the mortgaged property in the mode prescribed by law, unless the appellant shall pay the amount of said decree, with interest thereon and the costs, within sixty days from the filing of the record in this case in the proper court of the State of Iowa.

### Order.

This cause came on to be heard on the transcript of the record from the Supreme Court of the Territory of Iowa, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Supreme Court in this cause be and the same is hereby affirmed, with costs and damages at the rate of six per centum per annum, with leave to the appellees to sell the mortgaged property in the mode prescribed by law, unless the appellant shall pay the amount of said decree, with interest thereon, and the costs, within sixty days from the filing of the mandate in this case in the proper court of the State of Iowa.