HON. GEORGE G. WRIGHT, CHIEF JUSTICE.
   "   NORMAN W. ISBELL, } JUDGES.
   "   WM. G. WOODWARD, } JUDGES.

## ARNOLD v. GRIMES AND CHAPMAN.

Where, in an action of right to recover the possession of real estate, brought by the party holding the *legal* title, the defendant set up a defence, impeaching the patent under which 'the plaintiff claimed, and the court decided against the defendant, on the ground that his defence was *equitable* merely, and could not be set up as a defence against the legal title, in that action; and where the defendant subsequently, brought a suit in chancery to set aside the patent of the former plaintiff, on the ground of fraud; *Held*, That the former suit was not a prior adjudication of the validity of the patent.

Under the act of Congress of 1830, regulating pre-emptions, there was no appeal from the decision of the register and receiver, allowing a pre-emption, and there was no appeal in such cases, until the act of 1841, when an appeal was given to the secretary of the treasury, by one whose claim for a pre-emption was rejected.

The register of a land office, in issuing a certificate of purchase, and the com-

VOL. II.           1

missioner of the general land office, in issuing a patent, are but ministerial officers.

Where A., under the act of Congress of 1840, applied for a pre-emption, and took the oath required by the act of Congress, of 1838, and his claim was allowed by the receiver, and the register issued to said A. a certificate of purchase for the said land; and where the right of A. to the pre-emption, being contested by C., the commissioner of the general land office, directed the local land officers to hear testimony on the subject of the contest, and the commissioner subsequently canceled the certificate of A.; and where C., then claimed and proved up a pre-emption to the same parcel of land, under the act of 1841, received his certificate, March 21, 1843, and on the same day conveyed the land to G., in trust for the benefit of his creditors; and where a patent issued to C. on the 8th of March, 1845, and a patent was issued to A. on the 14th of March, 1849, which recited that the patent to C. had been revoked and canceled, being illegal; *Held*:

1. That when the government sold to A. in 1840, she parted with all her power over the land.

2. That the substantial right was in A. and that the government held the title in trust for him, and could make no farther sale which would be valid, unless his purchase should first be set aside in a proper legal proceeding.

3. That A. having obtained a patent, it attached in law to his original purchase, and his title was perfected.

4. That the commissioner of the general land office, possessed no power, to cancel A.'s certificate of purchase.

Land, once sold or appropriated by the government, even though not patented, cannot be sold again.

A junior patent under the first entry, will overreach an elder patent under a junior conflicting entry.

Where a patent has been issued through a mistake or fraud, to an individual who was not entitled to it, a court of equity will control the right of the patentee, by compelling him to convey to the person who has the better right.

When a decree in chancery is offered in evidence, the court can look so far back as the *bill*, in order to ascertain from that, with the decree, *what* the court determined; but it cannot look at the testimony, with a view of ascertaining whether there was sufficient evidence to *authorize* such decree of the court.

Where, by a suit in equity, a deed was decreed to be canceled and held for naught, on the ground that it was obtained by fraud and duress; *Held*, 1. That the deed was void *ab initio*; and that the decree did not make the deed void, but only declared it so. 2. That even if the deed was not invalid and inoperative *ab initio* as to all persons, but only from the rendition of the decree; yet, as to the party who obtained the deed by duress and fraud, the decree would have a retroactive effect, and the deed was absolutely void as to him.

Where C. by means of a deed, which he had obtained by fraud and duress, contested A.'s right to a pre-emption, which was set aside; and where C. then obtained a pre-emption on the same land, received a certificate of purchase, and on the same day, assigned the certificate to G. in trust for the benefit of

his creditors; and where G. admitted that he was cognizant of all the early facts of the case, and it appeared that G. had been a party to a suit by A. against C. to set aside the deed, and the decree in favor of A. vacating the deed, was rendered fourteen days before the issuance of the patent to C. under his certificate, which patent was subsequently revoked and canceled by the commissioner of the general land office; *Held*, That G. in point of *fact*, was a purchaser, with notice of all A.'s rights; and in point of *law*, he stood in the same attitude as C. himself.

As between conflicting entries, the doctrine of notice is utterly discarded.

### Appeal from the Des Moines District Court.

PRIOR to the pre-emption law of June 22, 1838, Arnold was settled upon the northeast quarter of section thirty-six in township seventy, north of range three, west of the fifth principle meridian, situate in Des Moines county, Iowa. W. W. Chapman was settled partly on the north side of the same quarter, and partly upon the adjacent tract. Chapman's improvements were on the said northeast quarter. They both settled upon these lands at an early day of the territory of Iowa, it being in 1835, and before the lands were surveyed; and the conflict of location arose, undoubtedly from this circumstance. A controversy arose and continued for some time, between A. and C. in relation to this quarter section, which controversy seems to have continued, on C.'s part, on account of his improvements being principally on the same. Arnold attempted to make a pre-emption of this quarter, under the act of June 22, 1838, but his right to a pre-emption was contested by Chapman, and he failed, from not being able to prove the required continuous residence. A. and C. then made a settlement and compromise of their difficulties, in which A., on the 29th of October, 1839, made to C., a warranty deed of twenty-seven acres off the north side of the above quarter, which included C.'s improvements.

The pre-emption act of June 22, 1838, contained this provision: That the person claiming the benefit of the act shall make oath, which oath "shall be filed with the register of the proper land office, when the land is applied for, and

Arnold v. Grimes and Chapman.

by said register to be sent to the office of the commissioner of public lands; that he entered upon the land which he claims, in his own right, and exclusively for his own use and benefit; and that he has not, directly or indirectly, made any agreement or contract, in any way or manner, with any person or persons whatever, by which the title which he might acquire from the government of the United States, should enure to the use or benefit of any one except himself, or to convey or to transfer the said land, or the title which he may acquire to the same, to any other person or persons whatever, at any subsequent time; and if such person, claiming the benefit of this law as aforesaid, shall swear falsely in the premises, he shall be subject to all the pains and penalties for perjury, forfeit the money which he may have paid for the land, and all the right and title to the said land; and any grant or conveyance which he may have made in pursuance of such agreement or contract as aforesaid, shall be void, except in the hands of a purchaser in good faith, for a valuable consideration, without notice."

The pre-emption act of June 1st, 1840, then passed, continued in force the act of June 22, 1838, till the 22d June, 1842, "and the right of pre-emption under its provisions is extended to all settlers on the public lands at the date of this act," that is, on the 1st of June, 1840, "with the same exceptions, general or special, and subject to all the limitations and conditions contained in the" act so continued.

Under the said act of 1840, Arnold again applied for a pre-emption, based on a new settlement, took the oath required by act of 1838, and his claim was allowed, and the receiver issued to him the usual duplicate receipt or certificate of payment for the above quarter, dated October 10, 1840. The register also issued a certificate, of which the following is a copy:

"No. 7383.  LAND OFFICE AT BURLINGTON,  
                      Iowa Territory, October 10, 1840.

"It is hereby certified, that in pursuance of law, Rodney Arnold, o Des Moines county, territory of Iowa, on this

day purchased of the register of this office, the lot or north-east quarter of section number thirty-six, in township number seventy, north of range number three, west; containing one hundred and sixty acres and — hundredths of an acre, at the rate of one dollar and twenty-five cents per acre, amounting to two hundred dollars and — cents, for which the said Rodney Arnold has made payment in full, as required by law. Now, therefore, be it known, that on presentation of this certificate to the commissioner of the general land office, the said Rodney Arnold shall be entitled to receive a patent for the land above described.

"A. C. DODGE, Register.

"Pre-emption Act, June 1st, 1840."

On the face of this certificate, is written the word "canceled." Chapman still contested Arnold's right of preemption, as appears (beside other ways), by his letters to the commissioner of the general land office, of date October 28, 1840, and June 28, 1841, and to the secretary of the treasury, June 30, 1841. With the last-mentioned letter, to the secretary, he sends a copy of the deed from Arnold to himself, certified by the recorder of deeds for Des Moines county. In this letter, he says, "my object is not to set aside his preemption, in order to enable me to bid upon *his* improvement, [but] to procure my own, which the unjustifiable act of the register and receiver has given him." The commissioner, by letter of July 22, 1841, directs the register and receiver to notify the parties of time and place, and hear testimony on the question, whether the above deed from Arnold to Chapman was, on the 1st of June, 1840, [should it not be 10th June?] in full force, and unrevoked by a reconveyance on agreement to that effect. These officers so construed the above, that they declined receiving testimony offered by Arnold, to the effect that the deed was executed under *duress*, and so was invalid. Communication was made to the commissioner on this subject, and he, by letter of September 29, 1841, says: "The testimony offered by Mr. Arnold, should be received by you, inasmuch as if the deed referred

Arnold v. Grimes and Chapman.

to, was invalid, there existed, at the time he took the pre-
emption affidavit, no contract or agreement *by which the title*
*he would acquire*, should enure to the benefit of another,"
&c. "The validity of the deed is essential in the determi-
nation of the point at issue." Testimony was afterwards
taken and forwarded to the commissioner, who, by letter of
February 11, 1842, holds it insufficient, and notifies the
register and receiver that the certificate No. 7383 (of Ar-
nold's pre-emption), was canceled.

The next step in this history is, that Chapman claims and
proves up a pre-emption of the *same* quarter section, under
the act of 1841, and gets his certificate, March 21, 1843,
and on the same day conveys the land to Grimes, in trust
for the benefit of Chapman's creditors. Arnold then, in No-
vember, 1841, files his bill in chancery in the District Court of
Des Moines county, against Chapman, alleging that the deed
(from A. to C.) was obtained by duress and fraud, and that
the same was void. Such proceedings were had in the
cause, that at the term of February, 1845, (8th March), a
decree was rendered, finding that "the bill and exhibits are
true;" "that the deed be canceled and held for nought;" and
that the contract and deed, and everything "connected
therewith, be hereby rescinded and forever set aside." A
certified transcript of the bill, answer, and decree in the
above cause, was, on the 30th of May, 1845, transmitted to
the commissioner, who replies on the 16th of June, 1845,
that "the land has been sold to another person, and a patent
issued therefor. This office, therefore, has no further con-
trol of the land, but must refer the party to the local court
for further action on his claim." The patent referred to, is-
sued March 8th, 1845. The commissioner was applied to
after this decree, to issue a patent to Arnold, "in order to
place him on an equality with Chapman in the courts of the
county." On the 26th of January, 1846, he replies, refer-
ring to the decree, &c., and says "from which it would ap-
pear, that the deed before referred to, was obtained under
duress from said Arnold, and has been held as utterly null
and void." And he says further, "This office cannot, as

Arnold v. Grimes and Chapman.

explained verbally to you, issue a second patent for the same land; but it has no hesitation in advising you, that the decision of your chancery court, in reference to the deed herein referred to, removed the only ground of objection to the validity of the claim of Mr. Arnold, placing it in the same position it occupied before the question of its forfeiture was entertained, because of the existence of that presumed valid deed; and that, had no patent issued, and the question now presented was as to the issue of a patent, as between the two conflicting entries of Arnold, under the act of 1840, and of Chapman, under the act of 1841, this office would feel bound to give the patent to Arnold. I should think your chancery court fully competent to do Mr. Arnold full justice in the matter, in the present state of the case."

On the 8th April, 1845, Grimes filed his declaration in, and sued out a writ of summons from the District Court in Des Moines county, in an action of right, seeking to recover this land from Arnold. The cause came to the Supreme Court, and this court, at the May term, 1849, held Arnold's defence to be an equitable one, and therefore not available against the patent of Chapman, and say: "The case must be affirmed, upon the ground that the patent was not impeachable in this action, collaterally, for fraud, and therefore the evidence was correctly excluded." 2 G. Greene, 77, 86. On the 14th of March, 1849, a patent was issued to Arnold, reciting that the patent to Chapman had been revoked and canceled, being illegal. On the 5th of November, 1845, Arnold filed his bill in this cause, in which two amended bills have since been filed. In the court below, a decree was rendered against the complainant, who now appeals.

*J. C. Hall* and *D. Rorer*, for the appellant.

*H. W. Starr* and *M. D. Browning*, for the appellees.

WOODWARD, J.—The first question to be determined, is that of a prior adjudication. It is said that the case of *Kriechbaum* v. *Bridges*, 1 Iowa, 14, is conclusive upon this

case. The cases are very unlike. In that, the defendant knew of his defence, but neglected to prepare it; he knew he wanted a witness who was absent; he knew a certain deed was lost, and that the acknowledgment of another was defective, so that it could not be offered in evidence without further proof. Yet he did nothing to remedy these difficulties, nor to supply the want. He neither asked a continuance, nor filed a bill in chancery, whilst in the case before us, Arnold did set up the whole matter of this suit as a defence in the former action of Grimes against him. The difficulty there was, that Grimes had the *legal* title, and Arnold's defence was of an equitable nature only, and the court decide against him, *merely* on this ground, and distinctly turn him over to a court of equity. See 2 G. Greene, 77, 86. And accordingly he is now in such a court.

We turn, then, to the inquiries which present themselves in this cause, in a court of equity. And it will be observed from the statement, that Arnold holds the senior certificate of pre-emption and the junior patent, whilst Chapman (or Grimes) holds the junior certificate and the elder patent. *All* of these papers, of course, cannot be valid; and it becomes necessary to ascertain which are, and which are not. In other words, it is necessary to ascertain what acts the commissioner of the land office, or other officer, can set aside, and what papers or documents of the nature of the foregoing he can annul and cancel. The first act which presents itself under this inquiry, is the cancelation, by the commissioner of the general land office, of Arnold's certificate of purchase under his pre-emption right. Had the commissioner the authority and power to do this? If he had, had he not also the authority to cancel and set aside Chapman's patent? When we come to the argument, we find it asserted that there was an appeal by Chapman from the decision of the register and receiver, allowing A.'s pre-emption, and that under this, the officer had the power. Did such an appeal exist in law? And was one taken? No act of Congress is found giving such an appeal, prior to that of September 4th, 1841, which allowed an appeal to the secretary of the treas-

ury.   The prior general pre-emption laws of May 29, 1830,
June 22, 1838, and June 1, 1840, contain no such provision.
But by the *instructions* issued upon the act of 1838, when
the register and receiver decided against a claimant, and he,
being desirous of it, requested in writing the opinion of the
general land office, they are directed to transmit the papers
and proofs.   Thus far it would seem, that if the claim was
*rejected* below, the commissioner might review it; but if the
claim was allowed, and a certificate of purchase issued, no
authority is yet seen for setting it aside.   Besides, an appeal,
as claimed, implies an adverse party.   But Chapman was
not then claiming a pre-emption of this land, and was not at
the trial, for reason, as he says, that he was sick.   What-
ever may have been the reason, it will not be contended that
his absence invalidated the sale.   He did, indeed, deny and
afterwards resist Arnold's right to pre-emption, but upon the
ground stated to the secretary of the treasury of June 30,
1841, and above quoted.   So that Chapman did not even
stand in a position to appeal.   In *Lytle* v. *The State of Arkan-
sas, 9* How. 315, 333, the Supreme Court of the United States,
in regard to this same subject, say, " From their decision, no
appeal was given."   This was under the act of 1830; and
it continued the same until that of 1841, when an appeal
was given to the secretary of the treasury, by *one whose
claim for a pre-emption was rejected.   Finally, no appeal was
taken.*   This is manifest from the correspondence between
Chapman, Arnold, and the officers, which is made evidence.
   The following facts appear from the letters, with the cer-
tificates:   The certificate of purchase, issued October 10,
1840.   On the 28th of October, Chapman complains to the
commissioner, that he had not been able to be at the hear-
ing, and had no opportunity of defending his claim; applies
for a hearing, and to have the case sent back, and requests
that the patent may not issue.   In a letter of the same date,
to the secretary, he protests against a patent issuing, " be-
cause the papers are insufficient," and says, Arnold did not
make out a case entitling him to the land.   In May, 1841,
the commissioner answers, that the evidence adduced in

support of A.'s claim "being entirely satisfactory," and "no substantial reason being given for a rehearing, this office would not feel itself justified in remanding the case;" but says he will suspend the issuing of a patent a reasonable time, that C. may produce evidence showing that A.'s claim was not valid under the law. In June, 1841, C. intimates to the commissioner the existence of the deed from A. to him. In July, 1841, the commissioner answers, that the existence of such a deed was not in evidence before the officer, and says the absence of evidence "fully justified this officer in confirming the entry made." The same month he writes to the secretary, sending a copy of A.'s deed, and urging it as against law, and as rendering the sale void, and says, his object is not, to enable him to bid upon A.'s improvements, but to procure his own. In July, 1841, the commissioner writes to the secretary, that no reply was made to C.'s letters of October, 1840, to the commissioner and secretary, "in consequence of the expectance of a report from the land offices, as usual in a contested case, until May 29, 1841, when it was ascertained by the posting of the returns from the Burlington district, that the entry of Mr. Arnold, under the act of June 1, 1840, had been made, per certificate 7383." He afterwards sends the matter back to the register and receiver, to take testimony on the question, whether on the 1st (10th) of June, 1840, "said deed was in full force and unrevoked; or, in other words, whether there then existed a contract or agreement by which the title Arnold might acquire, should enure to said Chapman;" and on their asking instruction, he directs them to receive testimony showing the deed invalid, for, says he, "if invalid, there existed no contract or agreement by which the title he could acquire should enure to the benefit of another." In November, 1841, the testimony was taken and reported to the commissioner, who decided the matter adverse to A.; and in February, 1842, notified the register and receiver that A.'s certificate was canceled. It will be seen by the opening statement, that C. afterwards proved a pre-emption to the same lands, obtained a certificate, and in 1845, received a patent; and that in 1849, after

Arnold v. Grimes and Chapman.

the decree of the court canceling the deed, a patent issued to A. declaring that to C. canceled.

There was then *no appeal*, but when the existence of the deed was brought to the knowledge of the commissioner, he undertook to adjudicate the questions pertaining to it, and to the validity of A.'s purchase; and then listens to the action of the court, rescinds his doings, and remits the party to the legal tribunals of the country. Is not this where the government should have gone in the beginning, to set aside A.'s purchase? Was there a purchase, when payment was made, and that certificate was delivered? And if so, could the executive departments of the government adjudicate it, and set it aside. Justice McLean, in *Ware* v. *Brush*, 1 McLean, 535, says: "The register, in issuing the warrant, acted ministerially, and so did the commissioner of the general land office, in issuing the patent. They could determine no matter which settled the right between the parties. Their duties were ministerial, not judicial." And, "it would be against all authority and reason, to hold that the acts of a ministerial officer can fix, absolutely, the rights of the parties." In this case, the party having the equitable right, was suffered to prevail against the holder of the patent.

In *Rogers* v. *Brent*, 5 Gil. 574, the court says, "If the commissioner issues a patent to a person not entitled to it, either the state or federal tribunals, may inquire and determine who has the better right." "A title derived from the government is no better than one derived from an individual owning the fee, and must be adjudged by the same rules of law; and a fraud may as well be perpetrated in obtaining a title from the government as from an individual, and it is the duty of the court to protect the injured party against the one, as well as the other."

In *Carroll* v. *Stafford*, 3 How. 460, the Supreme Court of the United States hold this language: "When the land was purchased and paid for, it was no longer the property of the United States, but of the purchaser. He held it for a final certificate, which could *no more be canceled by the United States than a patent.* It is true, if the land had been previously sold by the United States, or reserved from sale,

the certificate might be recalled by the United States, as having been issued through mistake. In this respect, there is no *difference* between the *certificate* holder and the *patentee*." "Now, lands which have been sold by the United States, can in no sense be called the property of the United States. They are no more the property of the United States than lands patented. So far as the rights of the purchasers are considered, they are protected under the patent certificate, as fully as under the patent. Suppose the officers of the government had sold a tract of land, received the purchase money, and issued a patent certificate, can it be contended that they could sell it again, and convey a good title? They could no more do this, than they could sell land a second time, which had been previously patented. When sold, the government, until the patent shall issue, holds the mere legal title for the land, in trust for the purchasers; and any second purchaser would take the land charged with the trust."

In *Stoddard* v. *Chambers*, 2 How. 285, the plaintiff held under a patent, and the defendant partly under a New Madrid certificate, and partly under a patent issued on another similar certificate; and the court treats these alike, and says: "It has been urged, that the first patent appropriates the land, and extinguishes all prior claims of inferior dignity. But this view is not sustainable. The issuing of a patent is a ministerial act, which must be performed according to law. A patent is utterly void and inoperative, which is issued for land which had been previously patented to another individual." This language seems to be applied, as well to the land held under the certificate, as that held under the patent. That claimed under the certificate, was appropriated only by having the certificate located upon it.

In *Morton* v. *Blankership*, 5 Missouri, 346, the subject undergoes a full examination. The court says: "But had the commissioner power to vacate Haydon's entry, to make room for Lowes? This is a power not given the commissioner by the act of Congress. Haydon (who held a certificate only) had purchased the land and paid for it, and the executive officer of the United States had no farther control

Arnold v. Grimes and Chapman.

over it, unless Haydon himself had applied to have his entry changed. No person can be deprived of life, liberty, or property, without due process of law. The proceeding by which Haydon's entry was attempted to be vacated, was clearly not a proceeding authorized by any law of the land, and was, therefore, an attempt to deprive him of his property, without due process of law. If his title was defective, this defect, under the existing laws, could be determined only in the courts of justice of the country." In this case, which was at law, the value given the certificate in relation to a patent, was by virtue of the state law, and our law is the same; but this point does not arise in the case at bar, which is in chancery.

In *Ross v. Basland,* 1 Pet. 655, a prior donation certificate held priority over a subsequent entry patent. And in *Bagnell v. Broderick,* 13 Pet. 450, an elder entry (or certificate), and junior patent, prevailed over an elder patent. Although the circumstances of these last two cases, differ from those in the one before us, yet it is conceived that the principle involved in them is the same, which is, that the land being once sold or appropriated (even though not yet patented), cannot be sold again. A junior patent, under the first entry, will overreach an elder patent under a junior conflicting entry. Where the patent has been issued, through a mistake or fraud, to an individual who was not entitled to it, a court of equity will control the right of the patentee, by compelling him to convey to the person who has the better right. See Justice McLEAN's opinion in *Bagnell v. Broderick,* 13 Pet. 455. This is a dissenting opinion, but these views do not conflict with those of the majority, and they are in accordance with the tenor of the cases. The dissent was upon the question, whether an elder certificate could prevail against a junior patent in an action at law, in a state allowing a certificate holder to maintain an action for possession, &c., upon his certificate. See also, *Ware v. Brush,* 1 McLean, 533; *Miller v. Kerr,* 7 Wheat. 212 ; *Boardman v. Reed,* 6 Pet. 328; *Threadgill v. Pintard,* 12 How. 24; *Bush v. Marshall,* 6 How. 284.

The same law has been held by our own court in *Caven-der* v. *Smith* (Burlington, May Term, 1851). Cavender's grantor purchased under a judgment rendered against Smith, whilst he held only the certificate of the register of the land office, Smith afterwards obtained a patent, and defends the action of Cavender, brought to recover the possession, by showing the legal title to be in himself by virtue of the patent. Of Smith's purchase by the certificate, the court say, "By this purchase, he acquired all the property which the United States had in the land. There was no reservation made. The sale was unconditional; the right acquired was absolute. All the equity, and in substance, the legal title, passed from the government to the purchaser, and the government retained only the formal, the merely technical, legal title, in trust for the purchaser, until the patent issued. Having once sold the land by certificate to one, the officers of the government could not sell it again, and convey a good title to another, even by patent, &c." And they cite and rely upon the case of *Carroll* v. *Stafford*, 3 How. 460.

It is worthy of observation, that in the correspondence, above somewhat freely quoted, the executive officer of the government, at length refers the parties to the judicial tribunals of the country for the determination of their rights. At about this period, this department adopts the correct view, and no longer takes upon itself duties of a judicial nature. In November, 1843, the commissioner of the general land office, under the direction of the secretary of the treasury, addresses a circular to the registers and receivers of the local offices, advising them, that *in future*, in adjudications upon pre-emption claims under the acts of 1838, 1840, and 1841, *no examination will be had, whether the person claiming has made any contract or agreement by which the right* or title which he might acquire, would *enure to the benefit of any other person, &c., a false swearing as to any of them*, he remarks, *being the proper subject of an examination by the judicial tribunals*. This instruction harmonizes the practice of the department, with the judicial decisions.

There are two or three cases, which, on a casual observa-

tion, seem to oppose the foregoing conclusion. The first is, that of *Gray* v. *McCance*, 14 Ill. 344. This was a case of *conflicting pre-emption* claims, and the ultimate decision of it, was upon an appeal to the secretary of the treasury, under the act of 1841, which act, we have above remarked, expressly gave such an appeal. And farther, there are some reasons in favor of a greater extent of power in the officers in a case of conflicting claims, than in an *ex parte* claim once acted upon. And there is certainly a great difference between such a case, and an adjudication of forfeiture, under a penal act. But, in regard to the case of the original parties, Gray and White, the only ground on which Gray and McCance can stand, is this: that a pre-emption right has been held to be property—a vested right, to some extent. See *Threadgill* v. *Pintard*, 12 How. 24; *Brush* v. *Marshall et al.*, 6 How. 284; *Doyle* v. *Knapp*, 3 Scam. 337; *Pierson* v. *David*, 1 Iowa, 23. And under this view, the officers might, possibly, be sustained in taking notice of, and examining the claim of White, which was prior in time, though presented subsequently, to that of Gray; for the very ground upon which the cases cited by us proceed, is that of giving preference to the prior right. Another case is *Dickinson* v. *Brown*, 9 Sm. & Mars. 130. The leading feature of this case, in respect to the matter now in view, is, that it was an action at law, in which a *certificate* was contending against a *patent*. But the court does assert the existence in the officers, of that power which we have above negatived. They do it, however, in faint terms, without argument or authority, and upon an assumed *practice*, which the department or bureau has itself abandoned, at least so far as bearing upon a case like the one at bar. See Circular to the Land Officers, of Nov. 11, 1843.

Now, if titles derived from the government, possess no more sanctity than others, and if her contracts and sales are to be judged by the same rules of law, how does this case stand? Arnold held a title bond from the government, certifying that he had paid for the land, and was entitled to a deed (or patent). The vendor, by her executive officer

(placing it in its strongest light), assumes to vacate this title bond, and set it aside.   If this may be so done, where is the security of property?—where is the due process of law?—and where the law of the land?—and for what purpose are the judicial tribunals?   But it is said, that if he swears falsely, he forfeits all right and title to the land.   This is true, but who is to judge whether he has sworn falsely?   He also subjects himself to the pains and penalties of perjury, but no commissioner ever assumed to inflict these penalties, and it is impossible to conceive how the commissioner could declare a forfeiture of his land, any more than he could inflict the pains of perjury.   In order that he should forfeit the land, he must have sworn falsely, but what tribunal has "found," that he has sworn falsely?—where is the record? We conclude then, that when the government sold to Arnold, in 1840, she parted with all her power over the land; that the substantial right was in A; and that the government held the title in trust for him, and could make no further sale which would be valid, unless his purchase should first be set aside, in a proper legal proceeding; and that, Arnold having obtained a patent, this attaches in law to his original purchase, and his title is perfected.

A further view, however, is presented, in this; that although the executive department of the government, may not have had authority to set aside Arnold's purchase, and to sell to Chapman, still the question remains for determination, by the judicial tribunals, whether the pre-emption of Arnold was not void, under the act of 1838.   And the deed to Chapman is set up, as the *fact* in the way.   We will examine the subject, under this view.   The executive department of the government, after much conflicting action, sent the party to the judicial department.   In obedience to this suggestion, he has so come.   Grimes first brought him into a court of law, and there he set up his defence, consisting of the whole matter of this suit; but that court sent him into chancery, and accordingly he appears in this court.   And here the argument stands thus: Chapman says that the act of 1838 was violated by the making of the deed from Arnold to him;

Arnold v. Grimes and Chapman.

that A.'s pre-emption was void therefor; and that he forfeited all interest in the land. To this, the answer is, that A. instituted a suit in equity against Chapman and Grimes, in a court of competent jurisdiction, for the purpose of testing this precise question, and the decree of that court was, that the *bill* and *exhibits are true*, and that the *deed be canceled, and held for naught.* And this bill, thus found true, alleges that the deed was obtained by *fraud and duress.* This decree would seem to put an end to the question concerning the effect of the deed, and the forfeiture of the pre-emption right, in consequence of it; but counsel contend, that the deed was not canceled by the decree on account of duress, but that it was so done, in order to relieve Arnold from the covenants of warranty therein, because it was inequitable that these covenants should hang over A. when C. had acquired the title from the government. It is true, that although the commissioner had no authority to set aside the first purchase, and sell to another, yet the courts might inquire into the real rights of the parties, and therefore this part of the inquiry is important. With a view to this matter, we are asked to go behind the decree, and look into the evidence, and find there that there was no case of fraud, or duress made out—no testimony adequate to support such a decree. We can look so far back as to the *bill*, in order to ascertain, from that, with the decree, *what* the court determined, but we cannot look at the testimony, with a view of ascertaining whether there was sufficient evidence to authorize such a decree of the court. If that decree was erroneous, in this respect, there was a remedy well known, but we are not now sitting in appeal or error upon it. No lawyer would seriously expect us, *thus* to revise the judgment of another court.

But was that decree on the validity of the deed, or was it merely to get rid of the covenants impending over Arnold? When we look at the allegations of the bill, and the finding of the court, there remains no room for doubt or argument. The bill alleges that the deed was obtained by fraud and duress, and the judgment finds the bill to be true, and .

decrees the deed to be canceled and held for naught. The allegations and proof of the bill meet one case, and do not meet the other, and the judgment answers to the bill. But, again: what meaning is there in the argument, that the above bill and decree were only to set aside the deed, on account of the impending covenants? According to Chapman's positions in this cause, that deed was void—*absolutely void—dead in the birth.* This is his very argument, and he uses it to destroy Arnold's entry. The covenants, then, in an absolutely void deed, would never harm Arnold. And, further still: Chapman having set A.'s pre-emption aside, by means of that deed, and having then himself purchased the title directly from the government, how could he ever make use of those covenants against Arnold. They would seem to be hardly of consequence enough to warrant the costs of a suit.

Another position which is urged upon us, is this: that in the above decree, the deed is not avoided *ab initio*, but only in the *future.* Although it is not necessary to determine this point, for reasons which will appear presently, it deserves some attention. Had the decree been to set aside the deed, in respect to the covenants, it might very well be said to operate *in futuro.* But as the decree was to cancel and hold for naught that deed, because it was obtained by fraud and duress, *can* the operation of the decree be merely a prospective one. The decree did not *make* the deed void, but declared it so. If it was void, for that reason, when the judgment was rendered, it *had always been so.* It is said that a deed obtained by duress is *voidable,* not *void.* But if the books mean anything, it is conceived that they must mean, that such an act is void. The duress "annuls consent;" there is no *consent;* there is no agreement; "void things are as no things." And it is no answer, to say that it may be confirmed. See 2 Bac. Ab. 775; Tom. Jac. Law Dic. *in titulo;* 1 Bouv. Inst. 226; 2 Ib. 437, and *in titulo;* 3 Ib. 669; 2 Pars. on Con. 66; Story on Con., § 393, n. (1); § 400; Chit. on Con. 206; 2 Kent, 234, 453; Swan's Treatise, 8; *Worcester* v. *Eaton,* 13 Mass. 371; 3 J. J. Mar-

Arnold v. Grimes and Chapman.

shall, 659.   But if the deed was not invalid and inoperative *ab initio*, as to all persons, but only from the rendition of the decree, it will make no difference as between A. and C. As to Chapman, at least, the judgment of the court would have a retroactive effect.   The only doubt which could arise, would be, as to innocent third persons whose interests intervened.   And this brings us to the next point made.

It is urged, finally, that Grimes is an innocent purchaser. If he *was* such a purchaser, yet he must lose, if Chapman's title had nothing to stand upon, as we are disposed to think was the case.   But this case need not be placed upon that basis.   The better question is, is Grimes an innocent purchaser ?   C. obtained his certificate, March 21, 1843, and on the *same day* conveyed to Grimes ; and the latter says he was cognizant of all these early facts in the history of the case.   Long before C. obtained his patent, Grimes had been made a party to the above-mentioned suit to vacate the deed, and the decree therein was rendered fourteen days before the issuance of the patent to C.   In point of *fact*, then, Grimes was a purchaser, with notice of all A.'s rights ; and, in a point of *law*, he stands in the same attitude : he is but Chapman himself, for he holds but as trustee for C.'s creditors.   This is conceded throughout the case.   Therefore, he is entitled to no notice of anything ; or rather, in truth, he has notice of everything, and he takes no better right than C. had : he is to be dealt with *as* Chapman.   And if he bought under judgments against C. in favor of creditors of the latter, this does not help him ; for those creditors had liens on no more than C. was entitled to.   Their judgments and liens, will not mend his title.   Finally, Grimes standing in C.'s shoes, the rule becomes applicable to him, that, "as between conflicting entries, the doctrine of notice is utterly discarded."   13 Pet. 454.   What matters it, then, whether the decree of the District Court found the deed void *ab initio*, or declared it void *in futuro* only.   It is as effective in the one case, as in the other, so far as Chapman is concerned, and, consequently, so far as Grimes is, also.

As to Chapman, himself, a court of chancery would have

to strain its conscience, to give him relief in any event. His improvements are on the quarter section which A. sought to pre-empt. He writes to the secretary :—" My object is not to set aside his pre-emption, in order to enable me to bid upon *his* improvements, but to procure my own," &c. Already had Arnold, not desiring to take them from him, made a settlement with him, which his own counsel calls *fair*, and conveyed to him the portion of land embracing those improvements. Why is he not content with this ? Why does he not rest here ? Arnold could never set up the provisions of the statute, to annul the deed. Chapman might have rested upon that deed, perfectly, securely. But, instead of this, he uses this deed to defeat Arnold's pre-emption, and then turns round and pre-empts A.'s land and all his improvements. If the peremptory terms of statute law, rendered it necessary for a court of equity to allow a *particeps criminis* to take such an advantage, it would be, at least, an unwelcome duty.

   Wherefore, it is considered, that the decree of the District Court be reversed, and that a writ of *procedendo* issue, directing the said court to render a decree in the above cause in conformity with this opinion.