## WARDWELL, ET AL., v. PAIGE, ET AL.

The 8th section of the act of Congress, approved September 4, 1841, enti-
tled, "An Act to appropriate the proceeds of the sales of the public
lands, and to grant pre-emption rights," operated as a present grant to
the State of Oregon, upon her admission into the Union, of the 500,-
000 acres of land for purposes of internal improvements therein
specified, requiring only a selection · by the state, in pursuance of the
requirements of said section, to subject the particular tracts selected
to the operation of the grant.

The act of the state legislature, approved October 19, 1860, entitled, " An
Act to provide for the possessory and pre-emption rights of 500,000
acres of land donated to the State of Oregon," and making provision
for locations upon the public lands of the United States, within the
limits of the state, by private individuals, with the right of pre-emp-
tion, in advance of any selection of such lands by the state, was valid,
and a locator under the same, or his successor in interest, upon com-
plying with the provisions of the subsequent acts of the legislature of
October 15, 1862, and October 26, 1868, in regard to payment for the
lands so located, became, as soon as such lands were selected by the
state in conformity with the act of Congress, entitled to a deed from
the state therefor.

One who subsequently applied for and obtained a deed from the proper
board in the name of the state, will be held in equity as a trustee of
the legal title for such locator, even though he had no notice of the
latter's claim.   The doctrine of notice has no application in such cases.
The state board had no power, after a valid disposal of state lands had
been made to one person, in accordance with law, to make another
disposal of the same lands to a different person, and want of notice is
no defense for the latter in the suit of the former for a conveyance of
title to himself.   The rule *caveat emptor* applies.

A valid law operates according to the intention of the law-maker.   The
several acts of the legislature upon the subject in controversy, show
unmistakably that the legislature intended that the locator under the
act of October 19, 1860, should have the exclusive right to procure
the title of the state under the act of Congress, in the lands located
and paid for in conformity with their requirements, and where lands
so located and paid for were afterwards selected by the state, in due
form, the right of the locator to a state deed therefor became perfect
and indefeasible, according to such intention.

APPEAL from Umatilla.   The facts are stated in the opinion.

By the Court, WATSON, J.:

This suit was brought by the appellants in the circuit court
for Umatilla county, to quiet their title to certain tracts of

land situated in Umatilla city, in said county, and for a conveyance to them of any title appellants might have acquired therein. The circuit court rendered a decree, *pro forma*, for the respondents, as it is understood, to facilitate an appeal and the final determination of the cause in this court.

Appellants claim through intermediate conveyances from Jesse S. Lurchin, who, they allege, obtained title to the premises, as a pre-emptor, under certain acts of the state legislature. The first of these acts, entitled, "An act to provide for the possessory and pre-emptory rights of 500,000 acres of land donated to the state," was approved October 19, 1860, and, in substance, provided, that any citizen, or person having duly declared his intention to become a citizen of the United States, might, in conformity with its requirements, locate a tract of land, containing not less than 40 nor more than 320 acres, upon any lands of the United States, whether surveyed or unsurveyed, subject to location as part of the 500,000 acres accruing to the state of Oregon, on her admission into the union, by virtue of the 8th section of the act of Congress, entitled, "An act to appropriate the proceeds of the sales of the public lands, and to grant pre-emption rights," approved September 4, 1841, and by making the prescribed application therefor to the governor, and obtaining his approval thereof, become entitled to possess, control and pre-empt the same upon certain other conditions therein specified as to payment of interest, the time and manner of making payment of the principal being expressly reserved as a subject for future legislation. (Sess. Laws, 1860, p. 55.)

A subsequent act, entitled, "An act to provide for the location of the public lands donated to the state of Oregon," approved October 15, 1862, recognizes the validity of locations made under the previous act, designed evidently to render such locations effectual, requires all persons having made such locations to pay the state for the lands embraced therein, at the rate specified in the previous act, viz.: one dollar and twenty-five cents per acre. (Gen. Laws, 1862, p. 105.)

The next and last act of the legislature upon the subject was approved October 26, 1868, and contained this provision: "Any person who had a valid right of pre-emption on any lands embraced in the 500,000 acre tract, granted to the state by the act of Congress of September 4, 1841, prior to June 1, 1864, or who shall be a successor in interest to such pre-emption right, shall be allowed, upon complying with the provisions of this act, to purchase the same at one dollar and twenty-five cents per acre, in currency."

It is shown, we think, beyond question, that Lurchin made his location, including the land in litigation here, under the act of October 19, 1860, and presented his application therefor, conformably to its requirements, to the goverer, by whom it was duly approved on September 19, 1862. The original application, with the governor's approval endorsed thereon, is part of the evidence in the case. But these facts are hardly controverted by respondents, and may safely be assumed as fully established. And there is just as little ground to contest the fact of Lurchin's payment for the land covered by his location.

A. C. Gibbs testifies that the money was received from Lurchin and paid into the state treasury. Mr. Gibbs was governor of the state at the time of this transaction, and acting as land commissioner for the state, under the act of October 15, 1862. A certificate, dated May 20, 1863, signed by him as governor, appears in the evidence, which recites payment by Lurchin for said lands. An entry upon the record kept by the state treasurer at the time, a certified copy of which is also in evidence, shows that this money was paid into the state treasury by Mr. Gibbs, as money received from Lurchin, on the 6th day of June, 1863. In a special message to the legislature in 1864, Governor Gibbs mentions the location and payment of Jesse S. Lurchin, among others, under the previous acts of October 19, 1860, and October 15, 1862, and refers to "a list of lands sold, hereunto attached." This list, published in connection with the special message, and

verified by the official certificate of the state treasurer, gives the names of locators and number of acres located, and amount of payment by each, but does not show any location or payment by Lurchin.     Upon this discrepancy alone respondents rely to rebut the evidence of payment afforded by the testimony and certificate of Mr. Gibbs, and the entry in the state treasurer's record.     That entry shows payment on June 6, 1863, and the first payment mentioned in the certified list accompanying the special message bears date September 24, 1863, over three months afterwards, and the list itself is certified to under date of September 7, 1864.     (House Journal, 1864, appendix, 194.)

It is certainly much more reasonable and just to conclude, under all these circumstances, that Lurchin's location and payment were omitted from this list through the oversight of the state treasurer, in making up the list, than that Governor Gibbs made an incorrect or false statement concerning it, both in his certificate and message, and subsequently in his sworn testimony, and also that the entry of payment, on the books of the same state treasurer, was either a mistake or a forgery. We regard the fact of payment by Lurchin to the state as conclusively established by the proof.

The lands embracing the Lurchin location were selected by the state, in conformity with the requirements of the act of Congress of September 4, 1841, on June 26, 1868, and the selection was finally approved by the proper department of the general government on February 12, 1870.     By joint resolution, adopted February 9, 1871, Congress assented to the application of the proceeds of the 500,000 acres granted to the state by the act of 1841, for internal improvements, to the support of common schools, as provided in section 2 of article 8 of the state constitution.     On September 26, 1871, the respondent, Paige, under whom the other respondents claim, obtained a deed from the board of commissioners for the sale of school lands, for the portion of the land embraced in the Lurchin location, which is in litigation in this suit.

We are clearly of the opinion that Lurchin, or his successors in interest, were entitled to the deed from the state instead of Paige. The 8th section of the act of Congress of September 4, 1841, operated as a present grant to the new states thereafter admitted into the union, of which Oregon was one. The words of the section in respect to such new states are: "And there shall be and *hereby is* granted to each new state that shall be hereafter admitted into the union, *upon such admission*," etc. (*Dall* v. *Meador*, 16 Cal., 295; *Schulenburg* v. *Harriman*, 21 Wall., 44.) The selection by the state, in such manner as might be prescribed by its legislature, was only necessary to identify the subject of the grant. Its title to the tracts so selected related back to its admission into the union. (*Leavenworth R. R. Co.* v. *United States*, 2 Otto, 733.)

But we conceive Lurchin's rights would have been the same after the state selection on June 26, 1868, if the title of the state had not commenced until that time. "A legislative grant operates as a law, as well as a transfer of the property, and has such force as the intent of the legislature requires." (*Schulenburg* v. *Harriman, supra.*)

The legislature may as well provide by law for the disposal of property to be acquired by the state, as for the disposal of such as already belongs to it. And if the intention is clear, the law will operate upon the future acquisition. This proposition will hardly be questioned. It is an inevitable deduction from the very notice of law.

Now the manifest purpose of the several acts of the state legislature, before referred to, was to enable the class of persons provided for, complying with their provisions as to lands accruing to the state under the act of September 4, 1841. The right to obtain such title by such persons, upon such compliance, was designed to be exclusive, or, in the language of the acts themselves, the "right to pre-empt." Upon the selection by the state of the tract covered by Lurchin's location as part of the 500,000 acres granted to the state by said

act of Congress, his right to pre-empt the same became perfect, and upon his making payment for the same he became fully entitled to a deed from the state therefor. (*Shipley* v. *Cowan*, 1 Otto, 330.)

It is claimed, however, on behalf of the respondents, that his payment was not sufficient in amount. It was at the rate of only one dollar and twenty-five cents per acre for the lands located. It is insisted that he should have paid an additional sum, equal to the difference between the amount paid and the full price of 320 acres, at the same rate per acre, under the requirements of an act of the legislature approved October 22, 1864. There are two answers to this objection, either of which is sufficient. In the first place, the provision cited from this act refers expressly to " settlers " under the act itself, and in the second place, the official list in evidence shows there was no deficiency in quantity in the state selection, including the tract covered by Lurchin's location. And besides this, the act of October 26, 1868, contains an express provision, as we have already seen, for payment in such cases as the present, at the rate of one dollar and twenty-five cents per acre in currency for the quantity actually located.

It seems to us quite unimportant whether Lurchin's location, under the act of October 19, 1860, was intended by that act to operate as a state selection, or whether, if so intended, there was a sufficient compliance with the requirements of such act on the part of the state authorities to render it valid as such selection; or, indeed, whether or not these provisions themselves were valid. He claimed under the law of the state, which gave him the right to locate and pre-empt under the right of the state to such lands, and its subsequent selection, in the same right, could not but have enured to his benefit.

The respondent, Paige, applied for and obtained his deed from the state board of commissioners for the sale of school lands, for the land in controversy, after its selection by the state as part of the 500,000 acres granted by the 8th section

of the act of Congress of September 4, 1841, and after the final approval of such selection by the proper department of the general government, Lurchin's right to a deed for the land had already become perfect, and nothing remained for the state to do but to make him the deed.

Respondents insist, however, that Paige was a *bona fide* purchaser for a valuable consideration, and that equity will not disturb his legal title. Section 6 of the act of October 19, 1860, provided for recording the application of the locator and approval of the governor in the office of the county clerk of the county in which the lands covered by the location might be situated, and declared such record should "be deemed to impart notice to all persons of the existence of such claim, from the date of presentation for record." Lurchin's application, with the governor's approval endorsed thereon, was recorded in the proper office, November 29, 1862. But the act authorizing such record, and declaring its effect as notice, having been repealed expressly by the subsequent act of October 15, 1862, containing an exigency clause operating to make the act take effect upon its approval by the governor, there is a question whether such record ever had any effect as constructive notice.

But if this record was inoperative, we think Paige and his co-respondents, under all the facts and circumstances appearing in the evidence, should be held affected with actual notice. But it is not essential, in our view of the law, whether respondents had notice or not. After Lurchin's right attached to the particular land covered by his location, the board of commissioners had no power to dispose of it to any one else, and if, after Lurchin's right had attached, Paige did, through mistake or otherwise, acquire the dry legal title, which, after Lurchin's payment, was all the title remaining in the state, he took it as trustee for Lurchin, or his successors in interest, and cannot retain it from them on the ground of want of notice. The doctrine of notice has no application in such cases, but the rule *caveat empta* applies. (*Arnold* v. *Grimes*,

2 Iowa, 1; *Taylor* v. *Brown*, 5 Cranch, 234; *Moran* v. *Palmer*, 13 Mich., 367; *Mayer* v. *McCulloch*, 1 Ind., 339.)

Respondents' counsel further claim that the act of the board of commissioners, in making the deed to Paige, operated as a final adjudication of the right to the land in controversy in his favor, and is conclusive of the whole question here. In *Cospe* v. *Brooks*, 8 Or., 222, this court held, that the decisions of this board could not be reviewed by writ of review in the courts. But Judge Boise, in delivering the opinion of the court in that case, takes occasion to say: " The board is the land department of this state, and their decisions as to who shall receive a patent to land is conclusive in the courts. But the courts may, on a proper showing, decree that the patentee holds the land as the trustee of one having a better right in equity." The right to resort to a court of equity, in a case of this nature, is here distinctly asserted, and the necessity for adopting such a course clearly shown. No relief could be had from a court of law against a party wrongfully obtaining a state deed. The decree of the circuit court must be reversed, and a decree entered for appellants, as prayed for in their complaint, for conveyance of title, with costs.

LORD, C. J., concurring.